1
2
3
4
5
6
7

8      **UNITED STATES DISTRICT COURT**

9      **EASTERN DISTRICT OF CALIFORNIA**

10

11   LENNIE HOPKINS,                                    ) Case No.: 1:13-cv-00031 JLT
                                                        )
12            Plaintiff,                                ) ORDER DIRECTING ENTRY OF JUDGMENT IN
                                                        ) FAVOR OF DEFENDANT CAROLN W. COLVIN,
13       v.                                             ) ACTING COMMISSIONER OF SOCIAL
                                                        ) SECURITY, AND AGAINST PLAINTIFF, LENNIE
14   CAROLYN W. COLVIN,                                 ) HOPKINS
     Acting Commissioner of Social Security,            )
15                                                      )
              Defendant.                                )
16   _____

17          Lennie Hopkins ("Plaintiff") asserts he is entitled benefits under Titles II and XVI of the Social

18   Security Act.  Plaintiff seeks judicial review of the decision denying his applications for benefits,

19   asserting the administrative law judge erred in evaluating the record and assessing the credibility of his

20   complaints.  For the reasons set forth below, the administrative decision is **AFFIRMED**.

21                                    <u>**PROCEDURAL HISTORY**</u>

22          Plaintiff filed applications for a disability insurance benefits and supplemental security income,

23   alleging disability beginning November 13, 2005.  (Doc. 13-3 at 12.)  Plaintiff's claims were denied

24   initially and upon reconsideration.  (*Id.*)  After requesting a hearing, Plaintiff testified before the

25   administrative law judge ("ALJ") on July 19, 2011.  (*Id.* at 12-23.)  The ALJ determined Plaintiff was

26   not disabled under the Social Security Act, and issued an order denying benefits on June 5, 2012.  (*Id.*

27   at 12-2013.)  Plaintiff requested review by the Appeals Council of Social Security, which denied review

28   of the ALJ's decision on November 13, 2012.  (*Id.* at 2-3.)  Therefore, the ALJ's determination became

1    the decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish his disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  Once a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to show the claimant is able to engage in substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

///

2

## DETERMINATION OF DISABILITY

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520(a)-(f); 416.920 (a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider objective medical evidence and opinion hearing testimony. 20 C.F.R. §§ 404.1527, 416.927.

### A.   Medical Evidence

Dr. Roxanne Morse performed a consultative psychological evaluation on January 29, 2009. (Doc. 13-8 at 2.) Plaintiff told Dr. Morse he was disabled because he "ha[d] a defibrillator machine inside of [his] heart, weakness, difficulty lifting over 10 pounds, unable to deal with any stressful situation, depression, [and] rapid loss of weight." (*Id.*) Plaintiff reported that he had been sober "approximately 1 to 2 weeks" from alcohol and "clean from Marijuana and Cocaine for approximately 12 months." (*Id.*) Dr. Morse noted Plaintiff was "able to perform all of the activities of daily living with some limitations on lifting." (*Id.* at 3.) Dr. Morse administered the Wechsler Adult Intelligence Scale III and Wechsler Memory Scale III tests, and noted that Plaintiff "displayed adequate effort and persistence." (*Id.*) According to Dr. Morse, the test results showed he had "difficulties with short-term memory, especially recall." (*Id.* at 4.) Dr. Morse observed:

> [T]he claimant was able to understand, remember, and carryout simple instructions. He would have moderate to marked difficulty with detailed and complex instructions. The claimant was able to maintain attention and concentration. The claimant displayed pace and persistence for the duration of the evaluation.
> …
> He is likely to perform optimally in a work environment requiring simple, repetitive tasks. This is especially true given his difficulties with short-term memory.

(*Id.* at 5.) Further, Dr. Morse opined that Plaintiff's "ability to interact with the public, supervisors, and coworkers appears to be adequate." (*Id.*)

On November 18, 2009, Plaintiff was treated at Doctors Medical Center for right knee pain following "an altercation with an unknown assailant." (Doc. 13-8 at 118; Doc. 13-11 at 24.) Plaintiff

3

was able to walk, but "complain[ed] of worsening pain with movement." (Doc. 13-8 at 119; Doc. 13-11 at 25.) An x-ray of his right knee showed "[m]inimal degenerative change" without "evidence of fracture or bony destructive lesion." (*Id.*)

On March 10, 2010, Dr. Kamath opined that Plaintiff "would do very well in situations which require him to be sitting in place such as a clerical position in his line of work as a security guard which also involves…, locking of doors." (Doc. 13-8 at 44-45.) Dr. Kamath explained that he "[w]ould not recommend work that requires prolonged standing, fast walking, running or climbing up and down stairs of more than 1 flight for long periods of time." (*Id.*)

Dr. Dat Do noted Plaintiff was stable and denied any chest pain on April 20, 2010. (Doc. 13-10 at 4.) Plaintiff reported having "shortness of breath with walking less than a block," and Dr. Do "encouraged [Plaintiff] to exercise daily for at least 30 minutes a day." (*Id.* at 4, 6.)

Dr. Murillo completed a psychiatric review technique and mental residual functional capacity assessment on October 4, 2010. (Doc. 13-8 at 54-70.) Dr. Murillo noted Plaintiff had a full scale IQ score of 74 and was mentally retarded. (*Id.* at 57.) Dr. Murillo indicated Plaintiff had mild restrictions of activities of daily living, and mild difficulties maintaining social functioning, as well as moderate difficulties in maintaining concentration, persistence, or pace. (*Id.* at 62.) Dr. Murillo opined Plaintiff was "not significantly limited" with the ability to understand, remember, and carry out very short and simple instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and all areas of social interaction. (*Id.* at 65-66.) Therefore, Dr. Murillo opined Plaintiff was able to perform simple, repetitive tasks. (*Id.* at 70.)

On October 5, 2010, Dr. Lydia Kiger completed a physical residual functional capacity assessment. (Doc. 13-8 at 71-75.) Dr. Kiger opined Plaintiff was able to lift and carry 10 pounds frequently, stand at least two hours in an eight- hour workday, and sit about six hours in an eight-hour workday. (*Id.* at 72.) However, she believed Plaintiff "must periodically alternate sitting and standing to relieve pain and discomfort," as the ALJ determined in Plaintiff's prior application for benefits. (*Id.*) Further, Dr. Kiger opined Plaintiff was able to frequently balance and crouch; occasionally climb ramps and stairs, stoop, kneel, and crawl; and never climb ladders, ropes, or scaffolds. (*Id.* at 73.)

On October 20, 2010, Dr. Do noted Plaintiff was "stable from a cardiac standpoint." (Doc. 13-8 at 104.) Dr. Do noted Plaintiff "complain[ed] of shortness of breath with walking less than a block," and that Plaintiff reported he was "still trying to apply for disability." (*Id.* at 104.) Dr. Do encouraged Plaintiff "to exercise daily for at least 30 minutes a day" and "to be compliant with low sodium, low fat and cholesterol diet." (*Id.* at 106.)

Dr. Do completed a residual functional capacity questionnaire on December 28, 2010. (Doc. 13-9 at 32-33.) Dr. Do noted Plaintiff was treated at his clinic every three months for cardiomyopathy, and opined Plaintiff's symptoms would "constantly" interfere with his ability to concentrate sufficiently to perform simple and repetitive tasks. (*Id.* at 32.) Dr. Do indicated Plaintiff was able to sit, stand, or walk for 15 minutes at one time; sit a total of three hours in an eight-hour day, stand/walk a total of three hours in an eight-hour day; and walk one city block without pain. (*Id.*) Further, Dr. Do opined Plaintiff would need to take unscheduled breaks every one to two hours. (*Id.*) Dr. Do believed Plaintiff could lift and carry less than ten pounds occasionally, and never more than ten pounds. (*Id.* at 33.)

Dr. Josephine Baisac, Plaintiff's treating neurologist, completed a residual functional capacity assessment on January 7, 2011. (Doc. 13-9 at 38-39.) She indicated Plaintiff had pain in both legs, postural dizziness, exertional fatigue, depression, and anxiety. (*Id.*) Dr. Baisac opined Plaintiff was able to walk less than three blocks, sit thirty minutes at one time and one hour total in an eight-hour day, as well as stand/walk thirty minutes at one time and one hour in an eight-hour day. (*Id.* at 38.) She believed Plaintiff would need an unscheduled fifteen-minute break each hour. (*Id.*) Further, Dr. Baisac opined Plaintiff was able to grasp, reach, and perform fine manipulation with each arm less than 50 percent of an eight-hour day. (*Id.*)

Dr. Matus opined Plaintiff suffered from an organic mental disorder and an affective disorder on January 10, 2011. (Doc. 13-9 at 40.) Dr. Matus determined Plaintiff had mild restrictions in his activities of daily living; no difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.* at 50.) According to Dr. Matus, Plaintiff was "not significantly limited" with his ability to understand, remember, and carry out very short and simple instructions. (*Id.* at 54.) Dr. Matus observed that there was no evidence that Plaintiff was limited with his ability to work in coordination with or proximity to others without being distracted by them, but

determined Plaintiff was "moderately limited" with his ability to interact with the general public and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.* at 54-55.) Dr. Matus determined Plaintiff's "[p]sychaitric impairment is severe, but no so severe that [he] is incapable of any work." (*Id.* at 56.) Dr. Matus concluded Plaintiff was "capable of performing SRT with limited public contact." (*Id.*)

Dr. Ian Ocrant reviewed the medical evidence on January 5, 2011, and affirmed the residual functional capacity assessment by Dr. Kiger. (Doc. 13-9 at 79.)

On January 7, 2011, Dr. Baisac noted Plaintiff visited her office "to have his disability papers again be resubmitted." (Doc. 13-9 at 87.) Plaintiff reported that he "was on training as a security guard but ha[d] not found a consistent job." (*Id.*)

Dr. Do noted Plaintiff denied having chest pain, and his symptoms were "stable" on March 22, 2011. (Doc. 13-9 at 82.) Plaintiff reported he "ha[d] not been able to find a job that is suitable," and was trying to apply for disability. (*Id.* at 83.) Dr. Do believed Plaintiff's application for disability was "very reasonable." (*Id.*)

Dr. Baisac treated Plaintiff on April 13, 2011, and noted Plaintiff was "somewhat debilitated since he … ha[d] occasional exertional dyspnea." (Doc. 13-9 at 86.) On May 2, 2011, Plaintiff was treated at the Health Services Agency. (Doc. 13-10 at 64.) Dr. Sasha Blurshteyn noted his heart condition was "stable" and controlled with medication. (*Id.*)

Dr. Baisac completed a second residual functional capacity assessment on May 17, 2011. (*Id.* at 102.) Dr. Baisac noted she treated Plaintiff "every 3-4 months" for chronic kidney disease, cardiomyopathy, and hypertension. (*Id.*) She noted Plaintiff's symptoms included postural dizziness, "generalized/chronic pain" and generalized fatigue. (*Id.*) According to Dr. Baisac, Plaintiff was able to walk half a block without rest, sit for five minutes at one time and one hour total in an eight-hour day, and stand/walk for ten minutes at one time and one hour total in an eight-hour day. (*Id.*) She opined Plaintiff was able to lift and carry ten pounds or less on an occasional basis, and that he was limited to using his hands, fingers, and arms for only twenty percent of an eight-hour workday. (*Id.* at 103.)

Dr. Blurshteyn completed a residual functional capacity questionnaire on June 23, 2011. (Doc. 13-11 at 71-73.) Dr. Blurshteyn noted Plaintiff had a history of cardiomyopathy and kidney failure,

and his symptoms included dizziness and fatigue. (*Id.* at 71.) She believed Plaintiff's impairments would "seldom" interfere with his ability to perform simple work-related tasks. (*Id.*) According to Dr. Blursteyn, Plaintiff was able to walk "1 block" without rest or significant pain, sit for 60 minutes at one time and eight hours total in an eight-hour day, and stand/walk for ten minutes at one time and two hours total in an eight-hour day. (*Id.*) Dr. Blursteyn believed Plaintiff would need a job that permitted him to shift from sitting to standing at will, and to take an unscheduled break "2-3 times" for ten minutes each day. (*Id.*) She believed Plaintiff could lift and carry less than 10 pounds occasionally, and could perform tasks using his arms "30%" of an eight-hour day. (*Id.* at 72.)

In July 2011, Dr. Do noted Plaintiff "ha[d] been relatively stable," but "complain[ed] of having shortness of breath with walking less than a block." (Doc. 13-12 at 3.) Dr. Do reported Plaintiff was "not . . . able to find a job that suits him." (*Id.*) Dr. Do again encouraged Plaintiff "to exercise daily for at least 30 minutes a day." (*Id.* at 5.)

Dr. Do completed a physical residual functional capacity questionnaire on September 13, 2012, which Plaintiff submitted to the Appeals Council after the ALJ denied his applications for benefits. (*See* Doc. 13-12 at 7.) He noted Plaintiff suffered from cardiomyopathy, hypertension, depression, and renal insufficiency, and his prognosis was "fair." (*Id.* at 8-9.) Dr. Do noted Plaintiff reported chest pain and "shortness of breath walking less than a block." (*Id.* at 8.) Dr. Do opined Plaintiff was incapable of low stress work because he "ha[d] symptoms of fatigue and shortness of breath with daily activity." (*Id.* at 9.) He believed Plaintiff could not sit more than one hour at a time or stand more than thirty minutes at one time. (*Id.* at 9-10.) Further, Dr. Do opined Plaintiff was able to sit, stand, or walk less than two hours in an eight-hour day, and would require six unscheduled breaks in every two-hour period. (*Id.* at 10.)

**B.    Administrative Hearing Testimony**

Plaintiff testified at the hearing before the ALJ on July 19, 2011. (Doc. 13-3 at 30.) He stated that he had a high school education and received training as a security guard. (*Id.* at 36.) Plaintiff reported he last worked as a security guard in March 2008, and stopped working when his company lost contracts and did not have enough hours for him to work. (*Id.*) Plaintiff reported that he "had a hard time getting to work because of not enough money for gas." (*Id.*)

He reported that he had been homeless almost six years, and lived for the past five years at the Salvation Army in Modesto, California. (Doc. 13-3 at 35-36.) Plaintiff said that he would leave the Salvation Army each morning at about 5:00 a.m., and "walk[] in a daze." (*Id.* at 38.) He would go to the mission to eat breakfast, and then go to the unemployment office to meet with a job developer and look for work as a security guard. (*Id.*) Plaintiff said he had no luck "because they [were] looking at how long [he had] been out of work." (*Id.*) He reported that he returned to the Salvation Army around 4:30 p.m. to shower, eat dinner, and lie down. (*Id.* at 39.)

Plaintiff stated that he either walked or took the bus to doctor appointments or the mission, which he estimated was three miles from the Salvation Army. (Doc. 13-3 at 40.) In addition, he walked to the unemployment office and the library, which was about twenty blocks, or two to three miles from the Salvation Army. (*Id.* at 45-46.) Plaintiff said he would take about a half-hour break to rest during the walk. (*Id.* at 46.)

He testified that he had problems standing on his feet for long periods of time, and estimated he could stand fifteen minutes at one time. (Doc. 13-3 at 40.) Also, Plaintiff believed he could sit for "like 45 minutes" before his legs "start[ed] cramping up." (*Id.*) Plaintiff said he was able to carry "10 to 20" pounds comfortably. (*Id.* at 41.)

The vocational expert ("VE") testified after Plaintiff at the hearing, and identified Plaintiff's past relevant work as a security guard as *DOT*[1] 372.667-018, which was "light, semiskilled, SVP: 3." (Doc. 13-3 at 47.) Also, the VE noted Plaintiff worked previously as a poultry eviscerator, *DOT* 525.687-074; dishwasher, *DOT* 599.687-030; delivery driver, *DOT* 299.477.010; and stock clerk, *DOT* 299.367-014. (*Id.* at 46-47.)

The ALJ asked the VE to consider a person the same age as Plaintiff with the same "education and work experience who [was] able to perform a reduced range of sedentary work." (Doc. 13-3 at 47.) Specifically, the hypothetical individual was:

> Able to lift and carry 10 pounds occasionally and frequently stand and walk in combination in 30 minute increments for a total of two hours in an eight-hour day, can

---

[1] *The Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

sit six hours an eight-hour day.  He can occasionally bend, stoop, twist, squat, kneel, crawl and climb stairs but can never climb ladders, ropes or scaffolds.  He is precluded from working at heights or around hazardous moving machinery and is limited to work involving simple instructions.

(*Id.*)  The VE opined that such a person was not able to perform Plaintiff's past work, but could perform other unskilled, sedentary work at SVP level 2.  (*Id.*)  The VE identified the following jobs as examples: ticket counter, *DOT* 219.587-010; addresser, *DOT* 209.587-010; and order clerk, *DOT* 209.576-014.  (*Id.*)

When questioned regarding "routine rest or break periods," the VE explained that workers usually "get two breaks and one lunch," and that "the breaks are anywhere from 10 to 15 minutes depending on the employer and the lunch break is anywhere from 30 minutes to an hour."  (Doc. 13-3 at 48.)  The VE opined that all work at all exertional levels would be precluded if someone "needed to take two additional breaks of 15 minutes or more in a work day because of fatigue."  (*Id.*)

**C.  The ALJ's Findings**

As an initial matter, the ALJ noted that Plaintiff had a prior application for disability insurance benefits that was denied by an ALJ on July 1, 2010.  (Doc. 13-3 at 12.)  The ALJ determined Plaintiff carried his burden to rebut the presumption of continuing non-disability "because new and medical evidence regarding [his] impairments has been submitted that post-dates the prior decision."  (*Id.*)  Specifically, the ALJ found Plaintiff "ha[d] a new severe impairment of polysubstance abuse in remission."  (*Id.*)

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of November 13, 2005.  (Doc. 13-3 at 15.)  Second, the ALJ found Plaintiff's severe impairments included: "congestive heart failure, borderline intellectual functioning, obesity, kidney disease, and polysubstance abuse in remission."  (*Id.*)  The ALJ found Plaintiff did not have an impairment or a combination of impairments that met or medically equaled a Listing.  (*Id.*)  Next, the ALJ determined:

[T]he claimant has the residual functional capacity to perform a wide range of sedentary work as defined in 20 CFR 404.1576(a) and 416.967(a) except the claimant is able to lift and carry 10 pounds occasionally and frequently; is able to stand and walk in combination for 30 minute[] increments for a total of two hours and sit six hours each during a normal eight-hour workday; is limited to occasional bending, stooping, twisting, squatting, kneeling, crawling, and climbing stairs, is unable to climb ladders, ropes, or scaffolds; is

precluded from working at heights or around hazardous moving machinery, and is limited to work involving simple instructions.

(Doc. 13-3 at 17.)  With this RFC, the ALJ found Plaintiff was unable to perform any past relevant work, but was able to perform "jobs that exist in significant numbers in the national economy."  (*Id.* at 21.)  Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act "from November 13, 2005, through the date of this decision."  (*Id.* at 22.)

## DISCUSSION AND ANALYSIS

Plaintiff asserts the ALJ's decision is not supported by substantial evidence because the ALJ (1) did not address all of Plaintiff's impairments, (2) failed to adequately address the Listings, (3) "did not give due deference to the opinions of Plaintiff's treating physicians," and (4) considered the wrong onset date as part of the credibility determination.  (Doc. 18 at 7.)  Further, Plaintiff asserts that he "was not provided a meaningful vocational assessment."  (*Id.*)  On the other hand, Defendant argues the ALJ's findings were free of reversible error and supported by substantial evidence.  (*Id.* at 7-13.)

**A.    Step Two Determination**

Plaintiff notes that he "was diagnosed with degenerative joint disease and knee arthralgias." (Doc. 18 at 8.)  According to Plaintiff, he "complained of knee pain" and "X-rays showed degenerative joint changes of the medial compartment of the right knee . . ." (*Id.*)  Plaintiff asserts the ALJ erred at Step Two because he failed to address these conditions.  (*Id.*)

The inquiry at Step Two is a *de minimus* screening "to dispose of groundless claims."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yucket*, 482 U.S. 137, 153-54 (1987)). The purpose is to identify claimants whose medical impairment makes it unlikely they would be disabled even if age, education, and experience are considered.  *Bowen*, 482 U.S. at 153 (1987).  A claimant must make a "threshold showing" (1) he has a medically determinable impairment or combination of impairments and (2) the impairment or combination of impairments is severe.  *Id.* at 146-47; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).  Thus, the burden of proof is on the claimant to establish a medically determinable severe impairment that significantly limits his physical or mental ability to do basic work activities, or the "abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(a), 416.921(a).

10

Importantly, the Ninth Circuit has determined that "[t]he mere existence of an impairment is insufficient proof of a disability." *Matthews v. Shalala*, 10 F.3d 678 (9th Cir. 1993). In other words, a medical diagnosis alone does not make an impairment qualify as "severe." Although Plaintiff has identified evidence that he has minimal degenerative joint changes in his right knee (*see* Doc. 13-8 at 119), he has not identified evidence demonstrating that the impairment is severe. Thus, Plaintiff failed to carry his burden to demonstrate this is a severe impairment.

**B.    Step Three Determination**

The Listings set forth by the Commissioner "define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citation omitted, emphasis in original). At step three of the sequential evaluation, the claimant bears the burden of demonstrating his impairments equal a listed impairment. *Bowen v. Yuckert*, 482 U.S. 137, 141, 146 n. 5 (1987); 20 C.F.R. §§ 404.1520(d). "If the impairment meets or equals a listed impairment, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step." *Bowen*, 482 U.S. at 141; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).

Here, the ALJ noted that he "considered all of the claimant's impairments individually and in combination but can find no evidence that the combined clinical findings from such impairments reach the level of severity contemplated in the Listings." (Doc. 13-3 at 15.) The ALJ found Plaintiff identified "no evidence of an impairment which meets or equals the criteria of a listed impairment or of a combination of impairment equivalent in severity (not in mere numbers) to a listed impairment." (*Id.*) According to Plaintiff, the ALJ erred because Plaintiff "has a consistently low ejection fraction and elevated serum creatinine levels approaching the criteria for listings 4.02 and 6.02." (Doc. 18 at 9.) Significantly, however, it is insufficient that Plaintiff was "approaching" the criteria; his impairment must "meet or equal" each of "the characteristics of a relevant listed impairment." *Bowen*, 482 U.S. at 141; *Tackett*, 180 F.3d at 1099. Because Plaintiff does not meet the criteria of the Listings, he fails to carry his burden at Step Three.

///

11

## C.     Credibility Evaluation

Plaintiff contends the ALJ erred in assessing his credibility.  (Doc. 18 at 15.)  In evaluating credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Second, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility by setting forth clear and convincing reasons for rejecting her subjective complaints.  *Id.* at 1036.

An adverse credibility determination must be based on clear and convincing evidence where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains."  *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).  Here, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (Doc. 13-3 at 18.)  However, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible ..." (*Id.*)

Plaintiff asserts that the ALJ erred in considering the work he performed in 2007, 2008, and 2009 because his alleged onset date was amended at the hearing to July 2, 2010.  (Doc. 18 at 15.) Plaintiff argues that because the ALJ considered the wrong onset date, the ALJ erroneously found the work history "diminished [his] credibility."  (*Id.*)  Notably, the ALJ acknowledged that a prior application stood as the "final decision" that Plaintiff was not disabled through July 1, 2010.  (Doc. 13-3 at 13.)  However, the ALJ considered Plaintiff's work history to establish that Plaintiff's "daily activities have, at least at times, been somewhat greater than [he] has generally reported."  (*Id.* at 18.) It is proper for the ALJ to consider inconsistencies between an individual's actions and statements regarding his limitations.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  Further, an ALJ may consider a claimant's work history as part of a credibility determination.  *See, e.g., Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (as part of the credibility assessment, the ALJ considered the claimant's work history and his admission that he left

his job for reasons other than his alleged impairment); *Drouin v. Sullivan,* 966 F.2d 1255, 1259 (9th Cir. 1992).  Therefore, the ALJ did not err in considering Plaintiff's work history prior to the amended onset date as part of the credibility determination.

Moreover, the ALJ considered Plaintiff's daily activities and the objective medical record as part of the adverse credibility determination.  (Doc. 13-3 at 19.)  These are also relevant factors for a credibility determination.  *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (the claimant's activities "suggest she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and boyfriend. She is able to manage her own finances..."); *Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 600 (9th Cir. 1999) ("conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility").  Consequently, the ALJ carried his burden to set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds."  *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958.

## D.     Evaluation of the Medical Evidence

In this circuit, the courts distinguish three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Further, an examining physician's opinion is given more weight than the opinion of non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

The opinion of a physician may be rejected with "specific and legitimate" reasons, supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  The ALJ's

resolution of the conflict must be upheld by the Court when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

Plaintiff asserts that "[t]he ALJ did not give due deference to the opinions of [his] treating physicians," Drs. Blurshteyn, Do, and Baisac. (Doc. 18 at 7, 11-12.)  Plaintiff notes that each of the physicians believed Plaintiff "would need additional breaks." (*Id.*, citing Doc. 13-3 at 20.)  He asserts that "doctors Blurshteyn and Baisac further opined that [Plaintiff] had limitations using his arms." (*Id.*)  In addition, Plaintiff asserts the ALJ erred in giving "little weight" to the opinion of Dr. Kamath. (*Id.* at 11-12.)  On the other hand, Defendant argues the ALJ's evaluation of the medical evidence was proper, because the ALJ set forth legally sufficient reasons to reject the physicians' opinions. (Doc. 19 at 8-10.)

### 1.    Dr. Blurshteyn

Although Plaintiff asserts the ALJ failed to explain why he gave "[l]ittle weight" to the opinion of Dr. Blurshteyn that Plaintiff was "only . . . able to use his arms 30% of the time," the ALJ explained that this portion of her opinion, unlike the remainder of her opinion, was not "supported by medical signs and findings." (Doc. 13-3 at 30.)  Importantly, an ALJ may reject the opinion of a physician solely because it lacks the support of "objective medical signs and findings." *Magallanes v. Bowen*, 881 F.2d 747, 754 (9th Cir. 1989).

In a Social Security Ruling, the Commissioner explained the opinion of a physician is not entitled to controlling weight when the "opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record." SSR 96-2p, 1996 SSR LEXIS 9, at *9.  Although Social Security Rulings issued by the Commissioner to clarify regulations and policies do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).  Consequently, the Ninth Circuit determined the opinion of a treating physician may be rejected when it is "conclusory and brief" and lacks support of clinical findings. *Magallanes*, 881 F.2d at 751; *see also Young v. Heckler*, 803 F.2d 963, 968 (9th Cir.

1   1986) (a physician's opinion may be rejected "if brief and conclusory in form with little in the way of

2   clinical findings to support [its] conclusion"); *Crane v. Shalala*, 76 F.3d 251, 253(9th Cir. 1996)

3   (finding "[t]he ALJ permissibly rejected… reports that did not contain any explanation of the bases of

4   their conclusion").

5         Review of the opinion offered by Dr. Blurshteyn confirms she failed to support her conclusions

6   with any signs or objective medical evidence.  (*See* Doc. 13-11 at 72.)  As explained above, the lack of

7   support is a specific, legitimate reason for rejecting the opinion of a treating physician. *See Young*, 803

8   F.2d at 968; *Crane*, 76 F.3d at 253.  Consequently, the ALJ's evaluation of her opinion was proper.

9         2.    Dr. Do

10        Plaintiff asserts that the ALJ erred in not adopting the opinion of Dr. Do, who opined Plaintiff

11  "had limitations using his arms."  (Doc. 18 at 11-12.)  The ALJ explained that he gave "little weight" to

12  the opinion of Dr. Do because he found "the claimant's condition has improved since th[e] opinion was

13  issued in 2010," his condition was stable as of early 2011, and his "ability to walk three miles several

14  day a week" conflicted with the limitations set forth by Dr. Do.  (Doc. 13-3 at 20.)

15        Plaintiff does not dispute the fact that the medical record shows improvement.  (*See* Doc. 18 at

16  11-12.)  Moreover, the Ninth Circuit has determined that an ALJ may reject a physician's opinion when

17  the physician sets forth restrictions that "appear to be inconsistent with the level of activity that [the

18  claimant] engaged in."  *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).  Here, although Dr.

19  Do opined Plaintiff was able to walk only one block, Plaintiff testified he walked twenty blocks to the

20  library.  (*Compare* Doc. 13-3 at 45-46 *with* Doc. 13-9 at 32.)  Thus, the level of activity Plaintiff

21  engaged in exceeded the limitations set forth by Dr. Do, and was a specific, legitimate reason for the

22  ALJ to give "less weight" to the opinion.[2]  *See Rollins*, 261 F.3d at 856.

23        3.    Dr. Baisac

24        The ALJ noted that Dr. Baisac completed assessments in both January and May 2011.  (Doc. 13-

25  3 at 20.)  In January, Dr. Baisac opined Plaintiff was able to "use his hands, fingers, and arms 50% of

26  the time during an eight-hour workday," and in May she limited Plaintiff to using "his hands, fingers,

27

28       [2] Notably, Dr. Do's opinion that was submitted to the Appeals Council suffers from the same infirmity.

and arms 20% of the time." (*Id.*)  In addition, she limited Plaintiff to walking three blocks in January, which was diminished to half a block in May.  (Doc. 13-9 at 38, 102.)  The ALJ gave "little weight" to the opinions because of their inconsistency with the record, which "reflect[ed] an improvement in the claimant's condition," and Plaintiff's level of activity.  (Doc. 13-3 at 21.)

As discussed above, the inconsistency with Plaintiff's "considerable about of walking" is a specific, legitimate reason for giving less weight to the opinion.  *See Rollins*, 261 F.3d at 856.  In addition, the Ninth Circuit determined a physician's opinions may be rejected when it is "unsupported by the record as a whole." *Mendoza v. Astrue, 371 Fed. App'x.* 829, 831-32 (9th Cir. 2010) (citing *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003)).  An opinion may also be rejected when an ALJ finds inconsistencies between a treating doctor's assessments.  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999) (explaining inconsistencies within a physician's report supports the decision to discount the opinions of a physician).

Importantly, when an ALJ believes the treating physician's opinion is unsupported by the objective medical evidence, the ALJ has a burden to "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986) (emphasis added). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).  Here, the ALJ observed that Plaintiff's "cardio condition was noted to be stable" in April 2011, and his "hypertension was noted to be fairly controlled." (Doc. 13-3 at 18.)  Similarly, the ALJ noted that Plaintiff's renal insufficiency and hyperlipidemia were stable.  (*Id.*)  The ALJ found the "conditions were noted in the medical evidence to be stable as of early 2011," yet Dr. Baisac "lower[ed] the claimant's ability to lift and carry." (*Id.* at 20-21.)  Therefore, the ALJ carried his burden to identify conflicting evidence in the record.  Because Dr. Baisac's opinions were inconsistent with one another, the medical record, and Plaintiff's level of activity, the ALJ set forth legally sufficient reasons for giving less weight to her opinions.  *See Batson*, 359 F.3d at 1195; *Morgan*, 169 F.3d at 603.

///

16

1

2          4.      Dr. Kamath

3          As noted by the ALJ, Dr. Kamath recommended Plaintiff "not work in situations that require

4   him to stand for very long periods of time and involve vigorous activities such as running, fast walking,

5   climbing up and down stairs more than one flight for long periods of time."  (Doc. 13-3 at 20.)

6   However, Dr. Kamath believed Plaintiff "would do very well in situations that require him to be sitting

7   such as a clerical position and in his line of work as a security guard."  (*Id.*) The ALJ gave "little

8   weight" to the opinion of Dr. Kamath "because [he] did not thoroughly provide specific weights and

    other limitation descriptions."  (*Id.*)

9          Plaintiff asserts the ALJ erred in giving "little weight" to the opinion, arguing that "[t]he fact

10  that Dr. Kamath does not provide specific weights should not diminish his opinion."  (Doc. 18 at 12.)

11  Under the Regulations, a medical opinion is a statement that "reflect[s] judgments about the nature and

12  severity of your impairment(s), including your symptoms, diagnosis, and prognosis, what you can do

13  despite your impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2),

14  416.927(a)(2).  Notably, the letter written by Dr. Kamath does not specifically state what Plaintiff is

15  able to do despite his impairments, although Dr. Kamath believed he was able to perform clerical work.

16  Because Dr. Kamath did not detail Plaintiff's limitations and abilities, or support his conclusion with

17  signs and laboratory findings, it was proper for the ALJ to give his opinion less weight.  *See* 20 C.F.R.

18  §§ 404.1527(a)(3), 416.927(a)(3) (explaining that "[t]he better an explanation a source provides for an

19  opinion, the more weight" it will be given).  Regardless, as Defendant observes, Dr. Kamath's opinion

20  supports the ALJ's ultimate conclusion that Plaintiff is able to work, and does not support a finding that

21  Plaintiff is disabled as defined by the Social Security Act.

22  **E.    Substantial Evidence Supports the RFC**

23         The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the

24  evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is

25  wrong."  SSR 96-2p, 1996 SSR LEXIS 9 at *8.  "It need only be such relevant evidence as a reasonable

26  mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in

27  the medical opinion."  *Id.*  Here, in formulating the RFC, the ALJ gave "substantial weight" to the

28  opinions of Drs. Morse, Murillo, and Blurshteyn; and "great weight" to the opinions of Drs. Kiger and

1    Matus.  (Doc. 13-3 at 19-20.)

2          Significantly, the opinion of an examining physician may be substantial evidence in support of

3    the Commissioner's decision when the opinion is based upon independent clinical findings. *Orn v.*

4    *Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

5    The opinions of non-examining physicians may be substantial evidence when "consistent with other

6    independent evidence in the record."  *Tonapetyan*, 242 F.3d at 1149.

7          Here, as noted by the ALJ, Dr. Morse examined Plaintiff and found Plaintiff was "able to

8    adequately interact with the public, supervisors, and coworkers."  (Doc. 13-3 at 19.) In addition, Dr.

9    Morse opined Plaintiff was "likely to perform optimally in a work environment requiring simple,

10   repetitive tasks."  (*Id.* at 19.)  Because the opinion was based upon independent clinical findings—

11   including intelligence and memory tests—Dr. Morse's opinion is substantial evidence in support of the

12   RFC determination that Plaintiff is able to perform simple, repetitive tasks.  Reviewing the medical

13   evidence, Dr. Murillo opined Plaintiff was able to perform simple, repetitive tasks; and Dr. Matus

14   determined that Plaintiff was "capable of performing [simple repetitive tasks] with limited public

15   contact."  (See Doc. 13-8 at 71; Doc. 13-9 ar 56).  These opinions were consistent with the opinions of

16   Dr. Morse and Dr. Blurshteyn, who opined that Plaintiff's mental symptoms were "seldom severe

17   enough to interfere with the attention and concentration require to perform simple work-related tasks."

18   (*See id.*; Doc. 13-11 at 71.)  Thus, the opinions of Drs. Murillo and Matus also support the finding that

19   Plaintiff is able to perform simple, repetitive tasks.

20         Furthermore, the findings regarding Plaintiff's physical limitations and abilities are supported

21   by Dr. Kiger, who determined Plaintiff was able to "stand-walk at least two hours in an eight-hour

22   workday and . . . sit about six hours in an eight-hour workday."  (Doc. 13-3 at 19.)  These findings are

23   consistent with the opinion of Plaintiff's treating physician, Dr. Blurshteyn, who opined Plaintiff would

24   be able to sit for more than six hours in an eight-hour day, and "stand-walk two hours in an eight-hour

25   workday."  (*See id.* at 20.)  Further, the findings are consistent with the recommendation from Dr.

26   Kamath that Plaintiff work in a situation that did not "require him to stand for very long periods of

27   time," such as a clerical position.  Consequently, the opinion of Dr. Kiger is substantial evidence

28   supporting the RFC determination that Plaintiff is able to perform "a wide range of sedentary work."

18

1    (*See id*. at 17.)

2    **F.      The Vocational Expert's Testimony and the Step Five Determination**

3              An ALJ may call a vocational expert "to testify as to (1) what jobs the claimant, given his or her

4    functional capacity, would be able to do; and (2) the availability of such jobs in the national economy."

5    *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999).  Here, Plaintiff asserts the ALJ erred in relying

6    upon the VE's testimony to find that Plaintiff is able to perform work in the regional and national

7    economy because the ALJ did not pose a hypothetical question that incorporated "limited public

8    contact" and "fail[ed] to include claimant's moderate limitations with regard to concentration

9    persistence and pace." (Doc. 18 at 8, 13.)  In addition, Plaintiff argues the VE's testimony that Plaintiff

10   could perform the work as ticket counter and order clerk conflicts with the *DOT*, because the jobs

11   require a Reasoning Level 3 and "a limitation to simple, repetitive tasks is inconsistent with reasoning

12   level 3."  (*Id.* at 14.)

13            1.      Hypothetical questions posed to the VE

14            When eliciting testimony from a vocational expert, the ALJ must set forth "hypothetical

15   questions to the vocational expert that 'set out all of the claimant's impairments' for the vocational

16   expert's consideration."  *Tackett*, 180 F.3d at 1101 (quoting *Gamer v. Sec'y of Health & Human Servs.*,

17   815 F.2d 1275, 1279 (9th Cir. 1987)).  Only limitations supported by substantial evidence must be

18   included. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006); *Osenbrock v. Apfel*, 240 F.3d

19   1157, 1163-65 (9th Cir. 2001). "If the assumptions in the hypothetical are not supported by the record,

20   the opinion of the vocational expert that the claimant has a residual working capacity has no

21   evidentiary value."  *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).  When the "weight of the

22   medical evidence supports the hypothetical questions posed," the ALJ's findings will be upheld by the

23   court.  *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1987); *see also Gallant*, 753 F.2d at 1456.

24            Plaintiff asserts that the vocational expert should have been asked about Dr. Matus' assessment

25   that Plaintiff could perform simple, repetitive tasks with "limited public contact."  (Doc. 18 at 8.)

26   However, the ALJ did not incorporate the limitation into the RFC.  Plaintiff does not argue, and cannot,

27   that the "limited public contact" determination is supported by the record.  To the contrary, the weight

28   of the record supports the finding that Plaintiff did not require limited public contact.  Dr. Morse opined

that Plaintiff's "ability to interact with the public, supervisors, and coworkers appears to be adequate." (Doc. 13-8 at 5.)  Dr. Murillo opined Plaintiff was "not significantly limited" with all areas of social interaction and adaptation, including "[t]he ability to interact appropriately with the general public." (*Id.* at 66.)  Likewise, Dr. Blurshteyn believed Plaintiff's impairments would "seldom" interfere with his ability to perform simple work-related tasks, and did not limit his contact with the public.  (Doc. 13-11 at 71.)  Therefore, the ALJ was not required to incorporate such a limitation in the questions posed to the vocational expert.[3]

Furthermore, the limitation to simple, repetitive tasks addressed Plaintiff's "moderate limitations" with regard to concentration, persistence and pace.  In *Sabin v. Astrue*, "the ALJ determined the end result of [the plaintiff's] *moderate* difficulties as to concentration, persistence, or pace was that she could do simple and repetitive tasks."  *Id.*, 337 Fed. Appx 617, 621 (9th Cir. 2009) (emphasis added).  Here, Drs. Murillo and Matus opined Plaintiff had "moderate difficulties in maintaining concentration, persistence, or pace." (Doc. 13-8 at 62; Doc. 13-9 at 50.)  The physicians believed Plaintiff was able to perform simple, repetitive tasks, and the ALJ gave substantial weight to these opinions.  (*See id;* Doc. 13-3 at 19.)  As in *Sabin*, Plaintiff's limitations with concentration, persistence and pace were addressed with the limitation to simple, repetitive tasks in the RFC.  Consequently, the ALJ did not err when he posed a question to the VE limiting the individual to "work involving simple instructions." *See Sabin*, 337 Fed. Appx at 621; *Stanley v. Astrue*, 2010 U.S. Dist. LEXIS 130755, at *16 (E.D. Cal. Nov. 30, 2010) ("in limiting Plaintiff to simple, repetitive tasks, the ALJ properly incorporated in his RFC finding [the physician's] opinion that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace").

2.     Reasoning Level 3 and the jobs identified by the VE

In the *Dictionary of Occupational Titles*, each job each job description includes a General Educational Development ("GED") definition that "embraces those aspects of education (formal and

---

[3]  Moreover, this Court has determined that the limitation to simple, repetitive tasks—or "unskilled" work as identified by the VE (*see* Doc. 13-3 at 47)—accommodates the need for a claimant's limited contact with the public. *Rogers v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 13741 at *33-35 (E.D. Cal. Jan. 25, 2011) *aff'd* 490 Fed. Appx. 15 (9th Cir. 2012); *Langford v. Astrue*, 2008 U.S. Dist. LEXIS 39294 at *22 (E.D. Cal. May 14, 2008) ("unskilled work . . . accommodated [the claimant's] need for 'limited contact with others'"); *see also* SSR 85-15, 1985 SSR LEXIS 20 (unskilled jobs "ordinarily involve primarily dealing with objects, rather than with data or people").

informal) which are required of the worker for satisfactory job performance." *Salas v. Astrue*, 2011 U.S. Dist. LEXIS 69620 at *16 (E.D. Cal. June 29, 2011) (quoting *Grigsby v. Astrue*, 2010 U.S. Dist. LEXIS 5465 (C.D. Cal. Jan. 22, 2010)).  The GED scale includes a scale for "reasoning development," which ranges from Level 1 (low) to Level 6 (high).  *Id.*  Here, Plaintiff asserts the VE's testimony conflicts with the job descriptions in the *DOT*, because the VE opined Plaintiff could perform work as ticket counter (*DOT* 219.587-010) and order clerk (*DOT* 209.576-014).  Plaintiff notes that both of these positions are identified in the *DOT* with a Reasoning Level 3[4], and argues this Reasoning Level exceeds that permitted by the RFC's limitation to simple, repetitive tasks.  (Doc. 18 at 14.)

Significantly, whether the restriction to simple and repetitive tasks conflicts with a Reasoning Level 3 is a question that has split the Circuit courts.  *Compare Terry v. Astrue* 580 F.3d 471, 478 (7th Cirl 2009) (finding no conflict between a job requiring Reasoning Level 3 and a claimant's limitation to simple work); *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (finding no apparent conflict with a claimant's inability to do complex work where the job identified required a Reasoning Level 3) *with Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (finding a limitation to "simple and routine tasks" inconsistent with Level 3 reasoning, but consistent with Level 2).  The Ninth Circuit has not addressed the issue, but District Courts in the Ninth Circuit have determined that a limitation to simple, routine tasks is consistent with Reasoning Level 2, rather than Reasoning Level 3.  *See, e.g., Gonzales v. Colvin,* 2013 U.S. Dist. LEXIS 34941 at * 13-14 (E.D. Cal. Mar. 13, 2013) (collecting cases and noting "courts in this circuit [have] concluded that a limitation to simple, repetitive tasks is consistent with both GED reasoning Level 1 and Level 2 jobs, but that such a limitation is not consistent with the DOT's description of jobs requiring GED reasoning Level 3"); *see also Burns v. Astrue*, 2010 U.S. Dist. LEXIS 123742 at *22 (C.D. Cal. Nov. 18, 2010); *Tudino v. Barnart*, 2008 U.S. Dist. LEXIS 113500, at *28 (S.D. Cal. Aug. 6, 2008).  Nevertheless, this Court need not resolve the conflict because, as Plaintiff acknowledges, the VE opined also that Plaintiff could perform work as an addresser (*DOT* 209.587-010), which requires Reasoning Level 2.  (*See* Doc. 18 at 14.)

---

[4] Reasoning Level 3 requires an individual to "apply commonsense understanding to carry out instructions furnished in a written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations."  *DOT*, App'x C(III).

21

1    The VE testified that there are 4,000 addresser positions in State of California.  (Doc. 13-3 at

2    47.)  Plaintiff asserts that "[i]t is questionable whether 4000 jobs spread across the entire state of

3    California is a significant number."  (Doc. 18 at 14.)  The Ninth Circuit "has never clearly established

4    the minimum number of jobs necessary to constitute a 'significant number.'"  *Barker v. Sec'y of Health*

5    *& Human Servs.*, 882 F.2d 1474, 1478 (9 th Cir. 1989).  However, the Court has determined that more

6    than 1,000 jobs satisfies the requirement that there be a "significant number" of positions in the

7    regional economy.  *See, e.g., Thomas*, 278 F.3d at 960 (finding 1,300 jobs in the state of Oregon to be a

8    "significant number"); *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9 th Cir. 1999) (finding the ALJ

9    "properly concluded that there was a significant number of . . . jobs in the local area" where the ALJ

10   found "there were between 1,000 and 1,500" regional positions).  Further, this Court has determined

11   that a vocational expert's testimony that a claimant could perform work as an usher where there were

12   2,756 positions in the State of California supported the ALJ's conclusion that the claimant could

13   perform work in "significant numbers."  *De La Cruz v. Astrue*, 2009 U.S. Dist. LEXIS 49636, at *27-

14   28 (E.D. Cal. May 28, 2009).  It follows then that the VE's testimony that there are 4,000 addresser

15   positions in the state supports the ALJ's conclusion that Plaintiff can perform work existing in

16   significant numbers.  Thus, any error by the VE in identifying work requiring Reasoning Level 3 is

17   harmless, because the ALJ's conclusion remains supported by the VE's testimony that Plaintiff can

18   perform unskilled, sedentary work such as an addresser.  *See Batson v. Comm'r of Soc. Sec.*, 359 F.3d

19   1190, 1197 (9th Cir. 2004) (finding an error harmless where it did not negate the validity of the ALJ's

20   ultimate conclusion); *see also Lara v. Astrue*, 305 Fed. Appx. 324, 326 (9th Cir. 2008) ("To the extent

21   the VE was overly broad and included jobs that [the plaintiff] could both perform and not perform, any

22   error is harmless so long as the jobs that could be done are enough to support the ALJ's decision").

23   Because the ALJ's hypothetical question to the VE included the limitations incorporated in the

24   RFC and supported by substantial evidence, the VE's testimony supports the ALJ's Step Five

25   determination that Plaintiff can perform work existing in significant numbers in the economy.

**<u>CONCLUSION AND ORDER</u>**

27   As discussed above, the ALJ applied the proper legal standards and his findings are supported

28   by the record.  Thus, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court.

1    *See Sanchez*, 812 F.2d at 510.

2          Based upon the foregoing, **IT IS HEREBY ORDERED**:

3          1.     The administrative decision is **AFFIRMED**; and

4          2.     The Clerk of Court is DIRECTED to enter judgment in favor of Defendant

5                 Carolyn Colvin, Acting Commissioner of Social Security, and against Plaintiff Lennie

6                 Hopkins.

7

8    IT IS SO ORDERED.

9          Dated:   __July 7, 2014__              _____ /s/ **Jennifer L. Thurston**

10                                                UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28